NOE v. RAPID RAILWAY CO.

1. STREET RAILWAYS — INJURY TO EMPLOYÉ — NEGLIGENCE — FEL-
    LOW-SERVANTS.

> An employé of an electric railway company, who, while
> returning from work on one of its cars, was injured through
> the negligence of the company in not providing a safe system
> for operating its road, is not precluded from recovery by the
> fact that the car was in charge of a fellow-servant.

2. SAME — ASSUMPTION OF RISK.

> An employé of an electric railway company, who was fur-
> nished with transportation on the company's cars in going to
> and returning from work, did not assume the risk of defective
> appliances in connection with the track over which he rode,
> as his work was performed at a distance therefrom, and he
> had no duty calling his attention thereto.

3. SAME — SAFETY DEVICES — UNLOCKED SWITCHES.

> An electric railway company is not relieved from the obliga-
> tion to equip its switches with locks by the fact that such
> companies generally make no such provision, if common pru-
> dence would suggest the adoption of the custom of steam
> roads in that particular. HOOKER, C. J., and GRANT, J., dis-
> senting.

4. SAME — TARGETS AND LIGHTS.

> But whether such companies should be held to the duty of
> maintaining targets or signal lights in the public highways, —
> quære.

5. SAME — EXCESSIVE SPEED OF CAR.

> Negligence may be predicated upon the failure of an electric
> railway company to require its cars to be slowed down on
> approaching a switch which was unprovided with a lock, tar-
> get, or light, though the misplacing of the switch was the
> only danger to be apprehended. HOOKER, C. J., and GRANT,
> J., dissenting.

6. SAME — PROXIMATE CAUSE.

> It cannot be said that the negligence of an electric railway
> company in not providing a lock for one of its switches was
> not the proximate cause of an injury occasioned by the throw-
> ing of the switch by a trespasser. HOOKER, C. J., and GRANT,
> J., dissenting.

Error to Macomb; Law, J., presiding. Submitted January 7, 1903. (Docket No. 7.) Decided May 12, 1903.

Case by Frank Noe against the Rapid Railway Company for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

*Byron R. Erskine* (*Gray & Gray*, of counsel), for appellant.

*Clark, Durfee & Allor*, for appellee.

MONTGOMERY, J. The plaintiff, who was an employé of the defendant company, recovered judgment against it in the Macomb circuit court for injuries received by him on January 7, 1900, by reason of a car on which he was being transported running into a switch which had been opened by the act of a third person. The defendant has brought error to this court, claiming that, from the undisputed testimony, a verdict should have been directed in its favor.

The defendant is organized under the general street-railway law of this State, and owns and operates a street railway along the Gratiot road between Detroit and Mt. Clemens, which railway is 15¼ miles in length. At the time of the accident, defendant's power house and barn was located in the township of Erin, Macomb county, about 7½ miles south of Mt. Clemens, and about 50 feet from the main track. Cars were operated in and out of this structure on switches connecting with the main line. At this time the defendant company had been constructing an addition to its power house and barn, and the plaintiff and several other laborers were engaged in the work. Plaintiff received 40 cents an hour for his services, and, in addition thereto, was transported to and from his work; his home being in Mt. Clemens; he riding on one of the company's regular employé passes.

On January 7, 1900, plaintiff and his colaborers had completed their work on the building. They had been

accustomed to take the car leaving the power house at 4:50 p. m., but on the night in question, in order to finish up, they worked later, and took the next càr, which left Detroit at 4:30, and arrived at the power house at 5:20 p. m. This car was on time. These cars were run according to a printed schedule, and were under the control of a train dispatcher, whose office was in Mt. Clemens. Regular meeting points were established along the line, and booths were constructed at these and other points, which were in telephonic communication with the dispatcher, who kept a daily record of the movements of the several cars. The cars going in opposite directions, when on time, would pass at regular meeting points, designated on the time-table. When late, they reported to the dispatcher, who designated the meeting point.

The car which plaintiff took at the power house proceeded towards Mt. Clemens. It met the south-bound car at switch No. 4, the regular meeting point, located some 2½ miles from the power house. It was delayed at this switch only about half a minute, and then proceeded on towards Mt. Clemens at the usual rate of speed. About half a mile from switch No. 4, and towards Mt. Clemens, was the gravel-pit switch,—so called because originally a spur had been constructed from this point to a gravel pit about a mile east of the main track. When the gravel pit had been exhausted, the spur track had been moved, except a stretch about 200 feet long, which could be used as a switch or siding for the passing of cars if for any reason a car was late and could not make the regular meeting point. To enter this spur switch, it had to be approached from the south. If a south-bound car desired to run into the switch, it would be necessary to run south of the switch points, throw the switch, change the trolley onto the switch overhead wire, which was independent, throw the current onto this wire, which was controlled by a switch on a post, and then back up.

On the evening in question, the south-bound car had passed over this switch about 1½ minutes before it met

plaintiff's car at switch No. 4. At the time, the gravel-pit switch was properly set for the main line. About 3 minutes thereafter, plaintiff's car, going north at the usual rate of speed, was wrecked at this switch; the same having been thrown open during this short interval. While sufficient evidence was not obtainable to justify apprehending any one, the fact that the switch was thrown open by human agency is not contradicted. It is an open question whether the act of throwing this switch was that of a malicious person or the act of children. The switch was not locked, nor was it provided with a light or target. The negligence charged is failure to have a light or target at the switch, failure to keep the switch locked, and failure to provide for slowing up the car at this point. Plaintiff recovered, and defendant brings error. Error is assigned simply upon the ground that the verdict should have been directed for defendant.

It is contended that the plaintiff was a fellow-servant of the motorman. If this be conceded, the result is not necessarily nonliability. True, the plaintiff would in such case be held to have assumed the risk of negligence of co-employés; but, according to plaintiff's theory, and upon the proofs, it cannot be said that the motorman's negligence was the cause of the injury. The fault, if any, was in not providing a safe system in running the cars, as the motorman was quite within his orders in running the train at full speed in disregard of this switch. The fault, then, if there was a fault, was the fault of the master, the company.

It is said the plaintiff also assumed the risk of these appliances, and the case of *Ragon* v. *Railway Co.*, 97 Mich. 265 (56 N. W. 612, 37 Am. St. Rep. 336), is cited in support of this contention. In the present case, however, the plaintiff had no duty which would bring to his attention the defects complained of. His work was performed at a distance from this switch, and no notice of the defects would come to him through his work, as his duties had no relation to the track. He simply rode over the track, as did any other passenger.

Defendant's counsel further contend that the testimony shows that targets, lights, and locks are not used on street or electric railway lines, and that, if the defendant has shown that the company observed the same care that other electric railways have exercised, this must be held to be due care. If we assume that it is not negligent to conduct a business in the usual manner (as to which see *Grand Rapids, etc., R. Co.* v. *Judson*, 34 Mich. 507), it remains to consider what shall furnish the standard. Can the defendant company neglect precautions which are taken by steam railroads against the same character of disaster as the defendant is called upon to guard against? We think not. It can make no difference whether the force which propels a car freighted with human beings, and going at a rate of 35 or 40 miles an hour, is one power or another. A misplaced switch is as sure to result in serious damage in one case as in the other. The question, more properly, is, What has human foresight provided as a safeguard against such a disaster? And common prudence would suggest an investigation into the methods of such a business as involved such contingencies as confront the operating company.

It is further contended that the failure to provide lights or locks cannot be said to be the proximate cause of the injury to plaintiff. We are not able to distinguish this case, as respects this question, from the case of *Town* v. *Railroad Co.*, 84 Mich. 214 (47 N. W. 665). See, also, *Birmingham Railway & Electric Co.* v. *Allen*, 99 Ala. 359 (13 South. 8, 20 L. R. A. 457).

Finding, as we do, that there was a case for the jury, the judgment is affirmed.

MOORE, J., concurred with MONTGOMERY, J.

CARPENTER, J. (*concurring*). I doubt the right of the jury to find that a street-railway company is under an obligation to place a target or light, which may possibly be an obstruction to travel, in the public highway. I

agree, however, that the judgment should be affirmed, for the other reasons stated in the opinion of Justice MONT-GOMERY.

HOOKER, C. J. ( *dissenting* ).   The defendant is a suburban railway company, and its road is a trolley road constructed along a highway.   The plaintiff, a mason, was employed in constructing an addition to its power house, for which he received, as compensation, 40 cents an hour for the time that he worked, and free transportation by defendant's cars to and from his home, some miles away from the place where he worked.   He was injured by reason of the derailment of a car near a switch, and recovered a judgment, upon which the defendant has brought error.

The plaintiff's claim is that his car was derailed, by reason of a misplaced switch, but a few minutes after a car had crossed the switch, when it was properly set.   It appears to be conceded that it was changed by human agency, and was the work of a trespasser,—possibly children.   Defendant claims that it was done by an adult, who did it from malicious motives, with an intent to wreck a car.   This is not clearly proved.   The switch was operated by a bar, heavily weighted, made to lie flat upon the ground, thereby offering no obstruction in the highway. It was an improved device, in common use upon such railways, and there is no proof indicating that a better or safer switch is in common use by roads of this character.   It was not locked, nor was there any provision for switch lights; and it is manifest that there could not be lights without having something in the nature of an obstruction in the highway.   There was no evidence that locks or lights upon switches or targets were in use by any street trolley road in the country.

The negligence complained of is:

1. Not keeping the gravel-pit switch closed.
2. Not having it locked or securely fastened.
3. Not keeping a light or signal at the switch, such as

would have indicated to a motorman whether the switch was open or closed.

4. Not running its car more slowly and with greater caution when approaching the switch.

The first three grounds may be considered together, and the question is reduced to the proposition that the railway company may be found guilty of negligence in these particulars notwithstanding its adoption of appliances in general use. The defendant cannot be said to be guilty of negligence for any of these supposed omissions. The only theories upon which it can be said, broadly, that it was negligent in not keeping its switch closed, are (1) that it was an insurer; and (2) that it omitted some duty in the way of measures which would have prevented its being opened. It cannot be claimed that it was an insurer, and counsel do not point out what measure it should have taken, except locking the switch,—and this is speculative,—as against a trespass. But the duty of locking the switch, like that of maintaining a switch light or a target, is one which depends on good railroading, which is a question of custom, and not one of opinion. In the case of *Michigan Cent. R. Co.* v. *Coleman*, 28 Mich. 449, it was said:

"The language used would fairly permit the jury to find anything to be negligence which could by any possibility be avoided. But negligence is neither more nor less than a failure of duty. All railroad companies are held to the duty of being prudent railroad companies, and bound to conduct their business with such precautions as prudence has usually found necessary. As compared with the care needed in business involving no possible human risk, the care to be used may be properly enough called extraordinary; but, as compared with each other, all such companies have the same duty."

In *Grand Rapids, etc., R. Co.* v. *Huntley*, 38 Mich. 546 (31 Am. Rep. 321), it was said:

"If they exercise their functions in the same way with prudent railway companies generally, and furnish their road and run it in the customary manner which is gen-

erally found and believed to be safe and prudent, they do all that is incumbent upon them."

Again, in *Werbowlsky* v. *Railway Co.*, 86 Mich. 239 (48 N. W. 1097, 24 Am. St. Rep. 120), it was said:

"The use of appliances which are in universal and common use for the same purpose cannot be said to be negligence."

There is no doubt of the efficacy of the switch used, under ordinary circumstances and conditions. The plaintiff's theory is that provision should be made for extraordinary ones; *e. g.*, he says that, had the switch been locked, it would not have been so easily misplaced, and, had the switch been a different one, provided with lights, the danger might have been discovered by the motorman in season for him to have stopped the car or reduced its speed. There is some truth in these claims, but it is easy for courts and juries to say, after an accident, that this or that might have prevented it. But courts and juries cannot prescribe methods; they can only apply the legal tests to those in operation, and that is the test of experience and custom. It is suggested (though this is not proved) that steam roads usually lock their switches, and use switch lights and targets, and we are asked to say that the duties of electric road companies should be measured by the methods of the steam road companies. It is undoubtedly true that the danger to be apprehended from the derailment of an electric car may be substantially the same as that from the derailment of a steam car running at the same rate of speed; but does it follow that a court or jury can say that the methods of the steam road must be taken as the standard of the electric road? There are other factors in the problem. A steam road is on a private right of way. Electric roads are frequently built in highways, where they must be driven over by persons using ordinary road conveyances and horses. Whether an upright switch, with a light upon it, would be practicable, may be doubtful; and this cannot be determined to be practicable by courts and juries, as against the settled practice of such

roads.   In this connection, see *Bennett* v. *Railroad Co.*, 163 N. Y. 1 (57 N. E. 79).

Another question relates to the rate of speed.   It is contended that it was the duty of this motorman to diminish the speed as he approached this switch.   If this is so, it must be for the reason that he should have guarded against the danger of a misplaced switch, for the evidence is undisputed that the switch itself offered no impediment to ordinary speed, or additional hazard, if not misplaced. There is evidence in the case that the motorman was directed not to check his speed at switches.   In other words, he was required not to have his car so under control that he could certainly avoid accident if the switch should be misplaced.   This testimony places upon the defendant the responsibility, if the testimony is believed; and the case is brought to the narrow point whether, with such appliances as are ordinarily used, the defendant was in duty bound to anticipate misplaced switches, and slow down its cars sufficiently to prevent accident from such cause.   We cannot say, as a matter of law, that every railway train or car, steam or electric, must, on approaching a switch, be brought down to a rate of speed which will enable the driver to stop in time to avoid accident if it shall be found to be misplaced; nor can a jury be permitted to so find, when it is undisputed that such is not the prevailing practice.   The testimony shows that this car was running at the ordinary speed, and that it was entirely safe to cross the switch at that rate of speed, and there is no testimony showing that it is not customary to depend upon unlocked switches, or that they have proven unsafe.   In this case it is claimed, though not proved, that there was danger to the car if run at an ordinary rate of speed around that particular curve; but the same rule that would make it a duty to slow up, lest, through a misplaced switch, the car should run on a dangerous track, would impose the same duty on approaching any switch, lest there be a car upon it, with which there would be danger of a collision should the switch prove to be misplaced, and

the same rule would apply to every steam road in the country, thus putting an end to rapid transit.

The steam roads have their appliances and methods. They may be, in a given case, negligent, but not where they are up to the standard of good railroading. It is contended, if not admitted, that this switch was misplaced by a trespasser, and, on the other hand, it is said that there are concurring causes, viz., the absence of the lock and light, and the failure to check the car. We have no inclination to minimize the rule that requires a carrier of passengers to do all that human care, vigilance, and foresight can do under the circumstances, considering the character and mode of conveyance, to prevent accident to passengers. This rule has its limitations, and, as said by the supreme court of Maine in *Libby* v. *Railroad Co.*, 85 Me. 34 (26 Atl. 943, 20 L. R. A. 812),—

" 'It must be understood that the rule does not require such a degree of vigilance as will be wholly inconsistent with the mode of conveyance adopted, and render it impracticable. Nor does it require the utmost degree of care which the human mind is capable of imagining.' *Tuller* v. *Talbot*, 23 Ill. 357 (76 Am. Dec. 695). * * * The test of liability is not whether the company used such particular foresight as is evident, after the accident happened, might have averted it had the danger been known, but whether it used that degree of care and prudence which a very cautious and prudent person would have used, under apparent circumstances of the case, to prevent the accident, without reasonable knowledge that it was likely to occur. 'In such a case it is always a question whether the mischief could have been reasonably foreseen. Nothing is so easy as to be wise after the event.' *Cornman* v. *Railway Co.*, 4 Hurl. & N. 781, 786."

See, also, *Fox* v. *Mayor, etc., of New York*, 70 Hun, 182 (24 N. Y. Supp. 43); *Bowen* v. *Railroad Co.*, 18 N. Y. 408 (72 Am. Dec. 529); *Stierle* v. *Railway Co.*, 156 N. Y. 70, 684 (50 N. E. 419, 834); *Ayers* v. *Railway Co.*, 156 N. Y. 104 (50 N. E. 960); *Jones* v. *Railway Co.*, 45 U. C. Q. B. 193.

A railroad need not anticipate a crime nor a trespass, unless there is something in the circumstances surrounding the transaction which should have directed the attention of its officers to the probability of such a danger. *Harris* v. *Railroad Co.*, 13 Fed. 591; *Worth* v. *Railway Co.*, 51 Fed. 171; *Keeley* v. *Railway Co.*, 47 How. Prac. 260; *Latch* v. *Railway Co.*, 3 Hurl.-& N. 930; *Deyo* v. *Railroad Co.*, 34 N. Y. 9, 18 (88 Am. Dec. 418); *Fredericks* v. *Railroad*, 157 Pa. St. 103 (27 Atl. 689, 22 L. R. A. 310); *Curtis* v. *Railroad Co.*, 18 N. Y. 534 (75 Am. Dec. 258); *Bennett* v. *Railroad Co.*, 163 N. Y. 1 (57 N. E. 79); *Whipple* v. *Railroad Co.*, 130 Mich. 460 (90 N. W. 287). The record shows an absence of negligence, and *prima facie* that the accident was due to a malicious trespass, which defendant had no reason to apprehend.

Counsel for the plaintiff rely upon *Town* v. *Railroad Co.*, 84 Mich. 221 (47 N. W. 665), as a case practically like the case before us. It differs in several respects. There the defendant was a steam road. Its settled practice was to use switch lights. It discontinued the use of a switch, and so notified the plaintiff. Afterwards it resumed using it, but neither notified the plaintiff nor restored the light. Had notice been given, and no light been seen upon the switch, we may assume that the plaintiff (the engineer) would have stopped his train. Had the light been in place, it would have shown danger. As it was, he supposed the switch spiked, and acted accordingly. In this case there not only had never been lights and locks upon the switches, but it was shown not to be usual upon such roads.

The question of proximate cause is involved in this case, as will be seen from several of the cases cited. Upon this point see, also, *Davis* v. *Railway Co.*, 93 Wis. 470 (67 N. W. 16, 33 L. R. A. 654, 57 Am. St. Rep. 935); *Smethurst* v. *Congregational Church*, 2 L. R. A. 695, 696, and note (148 Mass. 261, 19 N. E. 387, 12 Am. St. Rep. 550); *Read* v. *Nichols*, 7 L. R. A. 131, note (118 N. Y. 224, 23 N. E. 468); *Smith* v. *Kanawha County Court*,

8 L. R. A. 83, 84, note (33 W. Va. 713, 11 S. E. 1); *Smith-wick* v. *Hall & Upson Co.*, 12 L. R. A. 280, and note (59 Conn. 261, 21 Atl. 924); *Beall* v. *Township of Athens*, 81 Mich. 536 (45 N. W. 1014); *St. Clair Mineral Springs Co.* v. *City of St. Clair*, 96 Mich. 463 (56 N. W. 18); *Bleil* v. *Railway Co.*, 98 Mich. 228 (57 N. W. 117); *Lambeck* v. *Railroad Co.*, 106 Mich. 512 (64 N. W. 479); *Murphy* v. *Railroad Co.*, 107 Mich. 627 (65 N. W. 753); *Lamotte* v. *Boyce*, 105 Mich. 547 (63 N. W. 517); *Borck* v. *Nut Works*, 111 Mich. 129 (69 N. W. 254); *Kingsley* v. *Township of Bloomingdale*, 109 Mich. 340 (67 N. W. 333); *White* v. *Township of Riley*, 113 Mich. 299 (71 N. W. 502); *Smith* v. *Township of Walker*, 117 Mich. 15 (75 N. W. 141); *Doak* v. *Township of Saginaw*, 119 Mich. 680 (78 N. W. 883); *White* v. *Township of Riley*, 121 Mich. 413 (80 N. W. 124); *Bell* v. *Village of Wayne*, 123 Mich. 386 (82 N. W. 215).

The court should have directed a verdict for the defendant. The judgment should be reversed, and a new trial ordered.

GRANT, J., concurred with HOOKER, C. J.